# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

------------------------------x
UNITED STATES OF AMERICA    :
                              :
    v.                      :    Crim. No. 3:08CR00221(AWT)
                              :
DEAN C. TENN             :
------------------------------x

## RULING ON MOTION TO DISMISS

On December 23, 1998, Dean Tenn ("Tenn") was ordered removed from the United States to Jamaica. He was deported on February 2, 1999. He reentered the United States by boat in September 2006. On October 28, 2008, a federal grand jury indicted Tenn for violation of 8 U.S.C. § 1326(a) and (b)(1), being unlawfully present in the United States after having been deported and removed from the United States subsequent to a conviction for the commission of a felony. Tenn has moved to dismiss the indictment, challenging the validity of the removal order upon which the charge is predicated. In particular, Tenn contends that he was deprived of due process of law by ineffective assistance of counsel in connection with the deportation proceedings because his attorney failed to inform him about and failed to raise either of two available grounds for relief: 1) an application for a waiver of inadmissibility under former § 212(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(c) (effective to April 23, 1996), made in tandem with an adjustment of status application under INA § 245(a),

-1-

8 U.S.C. § 1255(a), which together are known as <u>Gabryelsky</u>

relief[1], and 2) an application for voluntary departure under

8 U.S.C. § 1229(c).

For the reasons set forth below, the defendant's motion to
dismiss the indictment is being granted.

## I.    FACTUAL BACKGROUND

Dean Tenn was born in Kingston, Jamaica in 1965 and was
admitted to the United States as a lawful permanent resident on
October 28, 1979.  He was 14 years old.  Tenn's mother,
grandmother, aunts and uncles were here, and he lived with his
relatives in Hartford, Connecticut.  He graduated from Weaver
High School in 1984 and from the Porter and Chester Institute in
1985.  Tenn worked consistently in high school and after
graduation, including positions at a tobacco farm, Arthur
Treacher's Fish and Chips, United Parcel Service, Gig Motors, Oak
Hill School for the Blind, Pier 1 Imports, Commercial Furniture,
Connolly Building, Innovation Builders, and Vision Builders.  For
some time, Tenn managed Dennis Market, a business he took over
from his grandmother around 1994.  Tenn paid income taxes.

In the early 1980s, Tenn met Stephanie Patrick, a Jamaican-
American born in the United States.  Tenn and Patrick began a
romantic relationship that continued until at least 1998.  Tenn

---

[1] <u>See</u> <u>Matter of Gabryelsky</u>, 20 I. & N. Dec. 750 (B.I.A. 1993).

and Patrick have 4 children together, born between 1986 and 1993, and have 5 grandchildren. In 1996, the couple purchased together a house in Middletown, Connecticut owned by Patrick.

Tenn and Patrick considered themselves married, and Patrick often used the name Stephanie Patrick-Tenn. The couple started seriously discussing marriage in 1992 and planned to get legally married. In the mid-1990s, Patrick purchased a wedding dress and started planning a wedding party. Tenn gave Patrick an engagement ring. They did not follow through with the wedding because Tenn's cousin was opening a club, and Tenn wanted to have the reception there but the club was not ready by the date Patrick had set. Then the relationship between Patrick and Tenn was strained and they "never ended up getting married." (Tr. Continued Mot. Hr'g 9, May 16, 2011 (Doc No. 112) ("Tr. 5/16/11").

Patrick testified that although she and Tenn were never legally married, they considered themselves to be a married couple:

> Q: Okay. Despite the fact that you never entered into a formal agreement, did you consider yourself married?
>
> A: Very much so. I mean, yeah, very much so. My -- like, I don't know how I should put it. In our culture, I guess, to be a piece of paper, it's really not a big deal to us. But we did consider ourselves married as a family, you know. We had our kids, we did everything with

our kids.  We considered ourselves as a couple, married, yeah.

. . . .

THE COURT:        You explained that in your culture a piece of paper really doesn't matter that much?

THE WITNESS:      Yes.

THE COURT:        Can you tell me what does matter?

THE WITNESS:      I mean, marriage is important, but common law marriage is –– it's not seen as a bad thing either. . . . I mean, the most important thing, we were a family, we were together.  Like I said, we were young when we got together and we held our family together.  We took care of our kids together.  So that was the important thing in my culture.  As a father, he took care of his kids, he took care of me, and that's what he did.

THE COURT:        Now, you said that you would have married him in a heartbeat if he asked you to ––

THE WITNESS:      Today?

THE COURT:        –– today and at the time of the deportation?

THE WITNESS:      Yes, I would.

THE COURT:        I think the one thing that ought to be clear, would that have been in your mind a real marriage?

THE WITNESS:      Would it have been a real marriage in my mind?  Yes.

-4-

```
        THE COURT:      And why?

        THE WITNESS:    Why?  Because, I mean, I've
                        never stopped loving him and
                        I'm pretty sure he's never
                        stopped loving me.  So yes, it
                        would have been a real
                        marriage.  We went through our
                        things but, like I said, we are
                        a family regardless.
```

(Id. at 7, 32).

Tenn testified to the same effect:

```
        Q:      Okay.Did Stephanie and you consider
                yourselves married?

        A:      Yeah, we did.  The only thing was
                just the papers, you know,

        Q:      Okay.  Did she use your name also?

        A:      Yeah.    Her    name    is    Stephanie
                Patrick-Tenn, that's her name.

        Q:      In fact, did you and her buy a piece
                of property in 1996?

        A:      Yeah. Bought property in Middletown,
                Connecticut.
        . . .

        Q:      Between the late 1980s and the time
                you got put back in deportation
                proceedings around '95, '96, were
                you living with Stephanie Patrick
                continuously?

        A:      Continuously.
```

(Tr. Continued Mot. Hr'g 8-9, 75, Apr. 5, 2011 (Doc. No. 103)

("Tr. 4/5/11").

On September 21, 1989, Tenn pled guilty in Connecticut

Superior Court to carrying a pistol without a permit, in

violation of Conn. Gen. Stat. § 29-35(a), and possession of a
narcotic substance, in violation of Conn. Gen. Stat. § 21a-
279(a).  On February 16, 1990, Tenn received notice that he was
subject to deportation pursuant to INA § 241(a)(11) for violating
a controlled substance law.  On July 24, 1992, the Immigration
Judge ("IJ") granted Tenn's application for relief under INA
§ 212(c) and terminated the deportation proceedings.

On May 3, 1994, Tenn was convicted in Connecticut Superior
Court of unlawful discharge of a firearm, an unclassified
misdemeanor, in violation of Conn. Gen. Stat. § 53-203.  This
conviction arose out of an incident that occurred at Dennis
Market, which Tenn took over managing from his grandmother.  On a
prior occasion, Tenn had been shot while working at the store.
Subsequently, Tenn got a shotgun to keep at the store.  During
the incident in question, a woman from the neighborhood came into
the store to warn Tenn that there were people outside who were
coming in to rob the store.  Tenn got the shotgun, pushed the
door open and fired one shot in the air.  When the police
arrived, he told them what had happened.  They told him he should
have called the police instead of firing a shot in the air and
charged him with unlawful discharge of a firearm.

On June 9, 1995, the defendant was convicted in Connecticut
Superior Court of possession of a narcotic substance, in
violation of Conn. Gen. Stat. § 21a-279(a).

On July 28, 1995, Tenn received notice that he was subject
to deportation for the 1989 and 1995 narcotics convictions.  Tenn
failed to appear at his scheduled hearing, and, as a result, on
April 2, 1996, the IJ ordered him deported to Jamaica <u>in
absentia</u>.  On July 1, 1997, the 1995 narcotics conviction was
vacated and the charge was nolled by the prosecution on the
grounds that Tenn had not been informed of potential immigration
consequences before he entered a guilty plea.

The United States Immigration and Naturalization Service
("INS") indicated that it did not oppose the reopening and
termination of deportation proceedings based on its receipt of a
copy of the vacated 1995 narcotics conviction; the record is
silent as to the 1989 narcotics conviction.  On July 3, 1997, the
IJ reopened and terminated proceedings on the deportation order.
The INS immediately instituted new proceedings, and on July 9,
1997, Tenn was notified that he was subject to deportation
pursuant to INA § 237(a)(2)(C) for convictions involving a
weapons violation and pursuant to INA § 237(a)(2)(B)(i) for
violation of a controlled substance law.  The new proceedings
were based on the 1989 narcotics conviction and the 1989 and 1994
firearm convictions.

On May 19, 1998, Tenn, through new counsel, Attorney
Crescenzo DeLuca ("DeLuca"), moved to terminate the new
deportation proceedings.  In his brief filed on August 21, 1998,

DeLuca argued that, following the termination of the proceedings as to the 1996 deportation order, the doctrines of res judicata and collateral estoppel barred the INS from instituting new deportation proceedings.

Prior to the evidentiary hearing, DeLuca submitted an affidavit in support of the government's opposition to the instant motion to dismiss. He submitted the affidavit without having had the benefit of obtaining from storage his file for his representation of Tenn. DeLuca reported that he had discussed with Tenn the options of marriage and adjustment of status and filing an application for § 212(c) relief before deciding to move to terminate the proceedings based on the doctrine of res judicata. In his affidavit, DeLuca stated:

> I recall discussing the fact that if he had married his girlfriend, apparently a U.S. citizen and the mother of his four children, that under the immigration law at that time, Mr. Tenn could file for a new resident card but that he would also need a waiver under Section 212(c) of the INA. At the time of these proceedings in 1998, the position of INS as well as the Immigration Court was that Section 212(c) relief was not available to individuals whose proceedings had been initiated after April 26, 1996. . . .

> I had, in fact, discussed with Mr. Tenn that there was considerable federal litigation pending challenging the retroactive application of the AEDPA and the elimination of Section 212(c) relief to individuals who had pled guilty to deportable offenses prior to the changes in the law, but who were placed in proceedings after their enactment. I made

> it clear to Mr. Tenn that there was a good
> likelihood of success on these legal arguments
> for 212(c) relief, but that he would have to
> likely remain in ICE custody until such time
> as this matter was resolved in the federal
> courts.  Further, I could not guarantee him
> that this position would necessarily prevail
> nor when such a determination could be made.
> Mr. Tenn made it clear to me that he did not
> wish to remain in custody for any further
> extended period of time.  I advised him that
> he would have to carefully reconsider this
> position as I believed that it would be in his
> best interest to remain in the United States
> should this 212(c) relief become available if
> he ultimately wanted to live and remain with
> his family in the United States.  We could
> then pursue appropriate motions to seek this
> relief.
>
> We also discussed another legal theory, which
> I believe had merit.  I advised Mr. Tenn that
> this theory could possibly result in the
> termination of his removal proceedings under
> law, without the necessity for 212(c) relief.
> I discussed with him my proposal to seek
> termination of the removal proceedings based
> upon the doctrine of res judicata.

(Gov.'s Resp. to Def.'s Mot. to Dismiss the Indictment, App. 1:

Aff. Att'y Cresenzo DeLuca ¶¶ 5, 8-9 (dated Mar. 22, 2010) (Doc.

No. 85-1).

In fact, as discussed below, Tenn was not taken into custody

until September 15, 1998, so his response to any suggestion that

he seek § 212(c) relief could not have been that he did not want

to remain in custody for any further extended period of time.

With respect to pursuing a strategy based on res judicata,

DeLuca stated: "I made it clear to Mr. Tenn that there was no

binding precedent case or law or authority on the specific

application of res judicata in immigration proceedings and that it was still likely that the Immigration Judge would not agree with us . . . ."  (Id. ¶ 9.)

In addition, DeLuca testified that Tenn "told me that he had four children here.  He told me that he had long residence in this country commencing when he was a teenager.  And that he wanted to stay in the United States with his family."  (Tr. 4/5/11, 95).

On July 25, 1998, Tenn and Patrick were involved in a domestic dispute.  Patrick's mother called the police, and Tenn was arrested for assault on September 15, 1998.  Tenn continued to live with Patrick "[o]ff and on" after the incident, and was living with her at the house in Middletown at the time of his arrest almost two months later.  (Id. at 67-68).

On December 23, 1998, Tenn appeared at a deportation hearing in Hartford.  Tenn was represented by DeLuca.  During the deportation hearing, DeLuca raised the defense of res judicata on behalf of Tenn.  DeLuca argued that res judicata barred his client's deportation because the criminal violations that were the basis for the deportation proceedings had been in existence at the time of a prior attempt to deport Tenn.  The 1989 narcotics conviction was then withdrawn as a basis for the proceeding on the theory that it had been previously adjudicated at the 1996 deportation hearing, but Tenn was ordered removed

based on the 1989 and 1995 firearm violations.  DeLuca did not
request any other relief.

To the contrary, during the hearing DeLuca stated to the IJ
that there was no other relief available to Tenn:

> IJ:      Any other relief in reply to
>          the court's ruling?
>
> DeLuca:  No, your honor.
>
> IJ:      No other relief is requested
>          because the respondent does not
>          (inaudible).
>
> DeLuca:  I don't believe he would
>          be eligible for any other
>          relief, Your Honor at the
>          present time.
>
> IJ:      Ok.

(Tr. Immigration Deportation Hr'g, Dec. 23, 1998 (cited in Def.'s
Mem. Supp. Mot. Dismiss at 5 (Doc. No. 72-4)).

The IJ entered an order that Tenn be removed to Jamaica and
denied Tenn's request for termination of the deportation
proceedings.  On December 31, 1998, Tenn signed a waiver of
appeal while incarcerated in the Segregation Unit at the Hartford
Correctional Center.  While not material for the purposes of the
instant motion, Tenn contends and DeLuca disputes that DeLuca was
not present when Tenn signed the waiver.  Tenn was removed on
February 2, 1999.

After his removal, Tenn lived in Jamaica and England for
several years before returning to the United States by boat in

September 2006.  Tenn lived in North Carolina and Nevada under various aliases.  During this time, Tenn had contact with his children, but not with Patrick.  Tenn testified that he "would never really come down in Connecticut" because he "was always scared of being arrested."  (Tr. 4/15/11, 87).

Tenn was arrested by Hartford police on August 16, 2008 on charges of marijuana possession that were pending in Connecticut Superior Court.  He had come to Hartford to attend the funeral of a relative.  After conducting surveillance at the funeral, United States Immigration and Customs Enforcement ("ICE") agents identified the defendant as he was driving his mother's car.  In September 2008, the state charges were dismissed and Tenn was placed in ICE custody.

## II.  LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b)(2) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."  Fed. R. Crim. P. 12(b)(2).  "The general issue in a criminal trial is, of course, whether the defendant is guilty of the offense charged."  United States v. Doe, 63 F.3d 121, 125 (2d Cir. 1995).  Ordinarily, a defendant is not entitled to raise in a pretrial motion a defense to liability for the crime charged, for "resolution of that question requires trial of

the general issue and is not properly decided in a pretrial motion." Id.

However, notwithstanding this general prohibition, a defendant charged with illegal reentry in violation of 8 U.S.C. § 1326(a) may challenge the validity of an underlying deportation order at the motion to dismiss stage. See, e.g., United States v. Lopez, 445 F.3d 90, 97-101 (2d Cir. 2006) (vacating defendant's conviction under § 1326(a) because district court failed to consider whether erroneous statements by IJ and Board of Immigration Appeals advising him that he was ineligible for § 212(c) relief rendered the deportation order fundamentally unfair); United States v. Calderon, 391 F.3d 370, 372-376 (2d Cir. 2004) (affirming order granting defendant's motion to dismiss the charge against him under § 1326(a) because IJ stated that he was ineligible for § 212(c) relief); United States v. Perez, 330 F.3d 97, 104 (2d Cir. 2003) (affirming order granting defendant's motion to dismiss the charge against him under § 1326(a) because counsel failed to file an application for § 212(c) relief).

## III. DISCUSSION

"Although the Supreme Court has not specifically determined the procedural safeguards to be accorded aliens in deportation or removal hearings, it is well settled that the procedures employed must satisfy due process." United States v. Gonzalez-Roque, 301

F. 3d 39, 45 (2d Cir. 2002) (citing <u>United States v. Fernandez-Antonia</u>, 278 F.3d 150, 156 (2d Cir. 2002)). "Consequently a defendant may collaterally attack an order of deportation on due process grounds where, as here, the order becomes an element of a criminal offense." <u>Id.</u> (citing <u>United States v. Mendoza-Lopez</u>, 481 U.S. 828, 838-39 (1987)).

An alien can challenge the validity of a removal order by demonstrating that he complied with the requirements of § 1326(d), which provides that:

> [A]n alien may not challenge the validity of the deportation order . . . unless the alien demonstrates that--(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d).[2]

## A. **Application for Section 212(c) Relief**

In <u>United States v. Cerna</u>, 603 F.3d 32 (2d Cir. 2010), the Immigration Judge found that Cerna was eligible for § 212(c)

---

[2] <u>See</u> <u>United States v. Mendoza-Lopez</u>, 481 U.S. 828 (1987) (holding that whenever the result of a deportation proceeding is used as an element of a criminal offense, an alien accused of such offense must be permitted to collaterally attack the deportation proceeding if it effectively eliminated the alien's right to obtain judicial review). Congress effectively codified the holding in <u>Mendoza-Lopez</u> by enacting 8 U.S.C. § 1326(d). <u>See</u> <u>United States v. Fernandez-Antonia</u>, 278 F.3d 150, 157 (2d Cir. 2002).

relief, and Cerna's attorney asked for and was granted 45 days to file Cerna's application. The attorney never filed the required documents, and never informed Cerna that he had failed to do so. The court discussed what must be shown to demonstrate that ineffective assistance of counsel in the form of a failure to file an application for § 212(c) relief satisfies the requirements of 8 U.S.C. § 1326(d). First, with respect to Section 1326(d)(1), the court noted:

> We have previously held that "the exhaustion requirement [of § 1326(d)(1)] must be excused where an alien's failure to exhaust results from an invalid waiver of the right to an administrative appeal." <u>United States v. Sosa</u>, 387 F.3d 131, 136 (2d Cir. 2004). However, if an alien knowingly and voluntarily waives his right to appeal an order of deportation, then his failure to exhaust administrative remedies will bar collateral attack on the order in a subsequent illegal reentry prosecution under § 1326(d).

<u>Cerna</u>, 603 F.3d at 38. Later in the opinion, the court elaborated on the grounds for excusing the administrative exhaustion requirement in Section 1326(d)(1) in the context of ineffective assistance of counsel, but prior to doing so it discussed the requirements of Sections 1326(d)(2) and (3). With respect to Section 1326(d)(2), the court stated that "[w]ith regard to § 1326(d)(2), we have previously held . . . that ineffective assistance of counsel in the form of a failure to file a § 212(c) application when an alien was eligible for such

relief can satisfy the requirement that the alien was improperly deprived of the opportunity for judicial review." Id. at 40 (citing United States v. Perez, 330 F.3d 97, 101 (2d Cir. 2003)). With respect to Section 1326(d)(3), the court stated:

> Further, in order to satisfy the requirement of § 1326(d)(3) that 'the entry of the [deportation] order was fundamentally unfair,' an alien must show 'both a fundamental procedural error and prejudice resulting from that error.' Perez, 330 F.3d at 104 (citing United States v. Fernandez-Antonia, 278 F.3d 150, 159 (2d Cir. 2002)). We have previously found that where counsel failed to file an application for relief under § 212(c), an alien can show both fundamental procedural error and prejudice by establishing that (1) a competent attorney would have filed the application, (2) the alien was prima facie eligible for § 212(c) relief, and (3) the alien could have made a strong showing in support of his application. Id. at 102.

Id. at 40-41. The court then concluded: "We now hold that ineffective assistance of counsel can be grounds for excusing the administrative exhaustion requirement of 8 U.S.C. § 1326(d)(1)." Id. at 42.

The court next discussed what Cerna would have to show, on remand, in order to be excused from the administrative exhaustion requirement:

> On remand, in order to be excused from the administrative exhaustion requirement of § 1326(d), Cerna will have to show " 'that his counsel's performance was so ineffective as to

-16-

> have impinged upon the fundamental fairness of
> the hearing in violation of the fifth
> amendment due process clause.' " <u>Perez</u>, 330
> F.3d at 101 (quoting <u>Saleh v. U.S. Dep't of
> Justice</u>, 962 F.2d 234, 241 (2d Cir. 1992)
> (internal quotation marks omitted)).

<u>Id.</u> at 42-43.  The court then concluded that in the context of a

claim of ineffective assistance of counsel in the form of failure

to file an application for § 212(c) relief, the analysis for each

of the clauses in Section 1326(d) was the same:

> This analysis will entail the same
> three-pronged inquiry that we have previously
> applied when assessing whether ineffective
> assistance of counsel in the form of a failure
> to file an application for § 212(c) relief can
> satisfy the requirements of § 1326(d)(2) and
> (3): (1) whether a competent attorney would
> have filed an application for § 212(c) relief,
> (2) whether the alien was prima facie eligible
> for such relief, and (3) whether the alien
> could have made a strong showing in support of
> his application.

<u>Id.</u> at 43.

The facts here are different from those in <u>Cerna</u> but not

materially so.  Filing an application for § 212(c) relief

involves at least two steps: making the client aware of the

option of doing so, and then, if the client desires to pursue

such relief, actually filing the application.  "Failure by an

attorney to inform his client of the availability of Section

212(c) relief, where such relief may save his client from the

harsh penalty of deportation, . . . evidences incompetence."

-17-

United States v. Etienne, No. CRIM.3-03-CR-190 JCH, 2005 WL
165384, at *6 (D. Conn. Jan. 14, 2005).  In Cerna, the first step
was taken but not the second.  Here, neither step was taken for a
client who, as discussed below, would have elected to not only
file the application for § 212(c) relief but also take the
additional steps necessary so that the filing of the application
would not be futile.  Thus, the three-pronged inquiry articulated
in Cerna is the appropriate analysis here.

### 1.    Whether a Competent Attorney Would Have Filed the Application

When the INS instituted new deportation proceedings against
Tenn on July 9, 1997, it sought to deport him on the basis of his
September 21, 1989 conviction for carrying a pistol without a
permit, his September 21, 1989 narcotics conviction, and his
May 3, 1994 conviction for unlawful discharge of a firearm.
Prior to the enactment of revisions to the immigration laws in
1996 and 1997, an alien in Tenn's position would have been able
to be considered for a form of relief from deportation referred
to as "Gabryelsky relief."  See Matter of Gabryelsky, 20 I. & N.
Dec. 750 (BIA 1993).  Gabryelsky relief came about as a result of
the fact that although an alien who was being deported on the
basis of a narcotics conviction was eligible for relief from
deportation on the basis of a § 212(c) waiver, an alien who was
being deported on the basis of a weapons offense was not eligible
for such relief.  On the other hand, an alien who had a

conviction for a weapons offense was eligible for adjustment of status, but an alien who had a narcotics conviction was not.  See Cato v. I.N.S., 84 F.3d 597, 602 (2d Cir. 1996) ("In sum, we hold that an alien, deported on the ground a weapons conviction, is ineligible for § 212(c) relief."); Gabryelsky, 20 I. & N. at 753-54 ("An alien deportable on the basis of a firearms conviction is ineligible for relief under section 212(c) because there is no exclusion ground corresponding to the deportation ground for conviction of a firearms offense.").

In Matter of Gabryelsky, the Board of Immigration Appeals ("BIA") held that an alien who (i) on his narcotics conviction is eligible for § 212(c) relief from deportation but ineligible for § 245(a) adjustment of status, and (ii) on his weapons conviction, is eligible for § 245(a) adjustment of status but ineligible for § 212(c) relief from deportation, can simultaneously apply for both forms of relief.  Gabryelsky, 20 I. & N. Dec. at 756.  "Gabryelsky relief operates under the legal fiction that the § 212(c) and § 245(a) procedures occur at exactly the same time, thereby eliminating the obstacle to relief otherwise posed by the other conviction."  Drax v. Reno, 338 F.3d 98, 111 (2d Cir. 2003).

"'Adjustment of status' is a form of relief that allows a deportable alien who would be admissible to the United States if he were seeking to enter the country to adjust his status to that

of an alien seeking entry." Id. at 113. Adjustment of status is provided for in INA § 245(a), codified at 8 U.S.C. § 1255(a). "[A]n adjustment of status is merely a procedural mechanism by which an alien [already within the United States] is assimilated to the position of one seeking to enter the United States." Matter of Rainford, 20 I. & N. Dec. 598, 601 (BIA 1992).

With regard to § 212(c) relief, it is significant that the institution of the new deportation proceedings against Tenn came after action by Congress in 1996 and 1997 intended first, to significantly restrict, and then, to entirely eliminate, the availability of § 212(c) waivers. INA § 212 excluded from the United States several classes of aliens, including those convicted of offenses involving moral turpitude or illegal trafficking in narcotics. However, this section was subject to a proviso granting the Attorney General broad discretion to admit excludable aliens. This provision, codified at 8 U.S.C. § 1182(c), stated:

> Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General. . . .

8 U.S.C. § 1182(c) (effective to April 23, 1996).

Although by its terms applicable only to exclusion proceedings, § 212(c) has been interpreted by the BIA to

-20-

authorize any permanent resident alien with "a lawful unrelinquished domicile of seven consecutive years" to apply for a discretionary waiver from deportation.  See Matter of Silva, 16 I. & N. Dec. 26, 30 (BIA 1976) ("In view of the ruling of the Court of Appeals for the Second Circuit in Francis v. INS, . . . [w]e conclude that, under the provisions of section 212(c) of the Act, a waiver of the ground of inadmissibility may be granted to a permanent resident alien in a deportation proceeding regardless of whether he departs the United States following the act or acts which render him deportable."); see also Judulang v. Holder, 132 S. Ct. 476, 488 (2011) ("§ 212(c) refers solely to exclusion decisions; its extension to deportation cases arose from the agency's extra-textual view that some similar relief should be available in that context to avoid unreasonable distinctions.").

On April 24, 1996, Congress amended § 212(c) to make relief unavailable to a broad category of aliens convicted of specific offenses through the enactment of § 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996) ("AEDPA").  The § 212(c) waiver was then eliminated entirely on April 1, 1997 through the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, 110 Stat. 3009 (Sept. 30, 1996) ("IIRIRA").

Following enactment of AEDPA and IIRIRA, there were court decisions which held that the pre-1996 version of § 212(c) relief remained available for certain eligible lawful permanent residents. In Matter of Soriano, 21 I. & N. Dec. 516, 517-22 (BIA 1996) ("Soriano I"), the BIA held that § 440(d) of AEDPA did not apply retroactively to aliens who had applied for § 212(c) relief before AEDPA was enacted, but did apply to all other aliens covered by the provision, including those whose deportation proceedings were commenced or whose criminal conduct or conviction occurred before AEDPA was enacted. However, the Attorney General vacated the BIA's decision in Soriano and, on February 21, 1997, concluded that § 440(d) was fully retroactive and applicable to all aliens who had committed one of the specific offenses and who had not been granted § 212(c) relief before AEDPA was enacted. See Matter of Soriano, 21 I. & N. Dec. 516, 533-40 (Op. Att'y Gen. Feb. 21, 1997) ("Soriano II"). The Attorney General's opinion, in effect, rendered all aliens in deportation proceedings ineligible for § 212(c) relief.

The Attorney General's opinion in Soriano II was the subject of much litigation at the time of Tenn's deportation hearing on December 23, 1998. A majority of the circuit courts, including the Second Circuit in Henderson v. INS, 157 F.3d 106, 129-30 (2d Cir. 1998), disagreed with the Soriano opinion. Ultimately, the

issue was resolved by the Supreme Court in <u>INS v. St. Cyr</u>, 533 U.S. 289 (2001).

In <u>INS v. St. Cyr</u>, the Supreme Court affirmed the Second Circuit's decision in <u>St. Cyr v. INS</u>, 229 F.3d 406 (2d Cir. 2000) and the decision in <u>Dunbar v. INS</u>, 64 F. Supp. 2d 47 (D. Conn. 1999), holding that the provisions of AEDPA and IIRIRA repealing § 212(c) relief did not apply retroactively to an alien who had pled guilty to the sale of a controlled substance prior to the statute's enactment. The Court "reasoned that aliens had agreed to those pleas with the possibility of discretionary relief in mind and that eliminating this prospect would ill comport with 'familiar considerations of fair notice, reasonable reliance, and settled expectations.'" <u>Judulang</u>, 132 S. Ct. at 481 (citing <u>INS v. St. Cyr</u>, 553 U.S. at 323). "Accordingly, § 212(c) has had an afterlife for resident aliens with old criminal convictions." <u>Id.</u> at 481.

Thus, at the time DeLuca moved to terminate the new deportation proceedings in May 1998, an application for <u>Gabryelsky</u> relief could have been filed, but it would have been filed with the knowledge that before Tenn could be afforded relief, not only would Tenn have to establish that he was entitled to a § 212(c) waiver and an adjustment of status under § 245(a), but there would also have to be a determination that AEDPA § 440(d) was not retroactive.

Although the law with respect to <u>Gabryelsky</u> relief was unsettled at the time of Tenn's deportation proceeding, DeLuca testified that he was aware of the arguments that would, less than three years later, lead to the Supreme Court's decision in <u>INS v. St. Cyr</u> providing for § 212(c) relief for deportees in Tenn's situation:

> Q: Were there any arguments, for lack of a better term, floating around with regard to the defendant's particular situation?
>
> A: Oh, absolutely.
>
> Q: What was that?
>
> A: The main argument was that it was an impermissible retroactive application for individuals who had particularly pled guilty in reliance of the state of the law to now find themselves unable to pursue the relief when it existed at the time they entered the plea.

(Tr. 4/5/11, 99).

DeLuca was asked about the availability, and his awareness of, literature concerning the significant changes in immigration law during this time period:

> THE COURT: Was there a lot of literature floating around about what was going on concerning these issues?
>
> THE WITNESS: Yes. [The American Immigration Lawyers Association] is an organization . . . that prides itself on keeping

-24-

> attorneys updated on
> developments in immigration
> laws so I did follow up all
> the locations in the web
> site.

(Id. 143).

DeLuca testified that at the time of Tenn's deportation hearing "there was encouraging signs that [§ 212(c) relief] would likely become the law again, that it would become available," and that it "[c]ould have been a year, could have been two years." (Id. at 105).  He also testified that during the 1998 to 1999 time frame he had perhaps 20 cases where clients were in Tenn's position, i.e. with convictions that pre-dated AEDPA and IIRIRA, and that it was his regular practice to advise them of the likely return of § 212(c).

DeLuca estimated that six to eight of his clients pursued § 212(c) appeals during that period.  He was able to identify four clients whose situations were comparable to that of Tenn, who applied for § 212(c) relief, were denied that relief and opted to appeal and wait for resolution from federal appellate courts.  One of those clients was a lawful permanent resident from Jamaica whose wife and two children were United States citizens.  A deportation hearing was held on December 18, 1997, i.e., before Tenn hired DeLuca.  The application for § 212(c) relief was denied.  Both DeLuca and the IJ discussed the fact that the Second Circuit was likely to decide the issue soon, and

they contemplated that DeLuca's client would appeal. DeLuca filed an appeal on June 5, 1998. Ultimately, the case was remanded to the IJ to consider a § 212(c) application. In another case where the client was also married to a United States citizen, the deportation hearing was held on September 29, 1998, and DeLuca requested § 212(c) relief at the hearing. In addition, at a deportation hearing on December 15, 1998, DeLuca requested cancellation of removal and adjustment of status. DeLuca admitted that the client was not then eligible for § 212(c) relief but did so to preserve the issue on appeal.

When asked about his other cases versus Tenn's case, DeLuca testified:

> Q: In these other cases where you actually were going to pursue 212(c) after AEDPA and IIRIRA, in at least some of those deportation proceedings, did you specifically reserve the argument at the deportation hearing for 212(c) relief?
>
> A: I did.
>
> Q: Why didn't you do that in the defendant's case?
>
> A: Again, I didn't think I needed to, primarily. And two, we weren't pursuing it because we weren't pursuing adjustment of status.

(Id. at 121-122). As to the first reason, the only reason Tenn would not need to preserve the argument for § 212(c) relief would be if DeLuca had some other argument he felt was more likely to

prevail, and he did not.  As to the second reason, the only

reason adjustment of status was not being pursued was that DeLuca

had not informed Tenn about § 212(c) and the additional steps

that would be necessary so that an application for § 212(c)

relief would not be futile.

On August 21, 1998, DeLuca submitted a brief in support of

his motion to terminate the deportation proceedings against Tenn.

(See Gov.'s Resp. to Def.'s Mot. to Dismiss the Indictment,

App. 5: 1998 Termination Mem. (dated Aug. 21, 1998) (Doc No. 85-

5).  DeLuca argued that because of the deportation proceedings

that were commenced in 1995 and terminated in 1997, principles of

res judicata barred the deportation proceedings that were

commenced in 1997.  DeLuca characterized the termination of the

prior proceedings, to which the INS told the IJ it did not

object, as a final judgment.  DeLuca relied on general principles

governing the doctrine of res judicata but cited no authority

directly on point in support of his contention that the

termination of the prior deportation proceedings constituted a

final judgment.  Consistent with DeLuca's statement in his

affidavit that he told Tenn it was likely that the IJ would not

agree with them, Tenn testified that DeLuca characterized the res

judicata argument as a "long shot."  (Tr. 4/5/11, 20, 44).

Tenn's recollection is that DeLuca "[o]nly put one option in

front of [him]," i.e., pursuing the res judicata argument.  (Id.

at 23).  The government asked Tenn to reconcile the statement
that he made in his affidavit that he would have stayed in jail
for one to three years in order to obtain relief that would allow
him to stay in this country with his decision to waive his right
to appeal only eight days after the IJ entered an order of
deportation.  Tenn's response was convincing: "See, listen, okay?
When you have options, it's different.  Okay?  When you have no
options, it's a totally different ball game.  If I had known
about certain things, yes, I would have stayed that time in jail.
I was ignorant to the situation.  Mr. DeLuca did not mention
those options."  (Id. at 44).  Later in the proceeding, Tenn
reiterated, "The only thing Mr. DeLuca really mentioned was res
judicata.  He didn't mention voluntary departure and he didn't
mention Gabryelsky relief or adjustment of status, none of
those."  (Id. at 80).

When the government questioned DeLuca about his decision not
to pursue § 212(c) relief, he testified:

> Q:  And in your estimation, practicing
> in front of Judge Carte, what would
> the likelihood have been of getting
> a continuance in that circumstance?
>
> A:  I don't think he would have had a
> problem with the marriage once we
> described the relationship.  But I
> think he would have looked at the
> ultimate relief, which was
> adjustment of status.  And as we
> discussed earlier, in order to get
> adjustment of status, he needed
> Section 212(c).  And since it was no

longer the law that he would get to
                    212(c), I don't think he would have
                    granted the continuance.

          Q:        Now, did you discuss getting married
                    with the defendant?

          A:        Briefly.

          Q:        What, in substance, did you tell
                    him?

          A:        Well, I said -- essentially we
                    discussed that he could get married
                    and we could pursue the I-130, but
                    that in fact I don't think it would
                    stop the removal right now or in
                    terms of the case, that the judge
                    would have to find him removable. I
                    don't think I could continue the
                    case for the reasons I just
                    articulated, but that it was an
                    option available to him in the
                    future if 212(c) came back into law.

(Id. at 103-4).  At one point, DeLuca stated that he had
discussed Gabryelsky with Tenn, but then backed away from that
position:

          Q:        Did you explain to Mr. Tenn that you
                    thought the 212(c) would come back?

          A:        I did. I thought ultimately at some
                    point there was a likelihood that it
                    was going to come back.

          Q:        And did you explain to him what he
                    would need to do in order to be
                    available to apply for 212(c) when
                    it came back?

          A:        I said he could get married and that
                    he could pursue the Gabryelsky.  I
                    don't know if I identified
                    Gabryelsky. . . .

                              -29-

I think this is what I conveyed to
him. If we pursued the res judicata
and we lost, we could appeal. The
order would be stayed. If in fact
212(c) came into -- if the 212(c)
litigation resulted in 212(c)
becoming available, we could pursue
it at a later day. That was
essentially what we discussed.

(Id. at 114-15). DeLuca testified further:

A: Again, I did emphasize the res
judicata, there's no question about
that.

Q: [But] you also discussed the 212(c)?

A: I told him that ultimately -- it was
my belief that 212(c) was going to
come back, but that it was not
available in these proceedings, but
that if we lost on the res judicata,
we could appeal, and that if 212(c)
became the law again, it was
available again, we could move to
reopen the case to pursue the
212(c).

(Id. at 116). All of this is consistent with Tenn's testimony

that although "[w]e might have talked about 212(c), but at the

time, 212(c), he told me they did away with that." (Id. at 20).

DeLuca testified that Tenn had "strong equities" supporting

§ 212(c) relief. (Id. at 137-38). But DeLuca never raised

§ 212(c) relief during Tenn's 1998 deportation hearing. DeLuca

only pursued the res judicata argument and, when asked by the IJ

if any other relief was available, responded in the negative:

```
IJ:    Any other relief in reply to the
       court's ruling?

D:     No, your honor.

IJ:    No other relief is requested because
       the respondent does not (inaudible).

D:     I don't believe he would be eligible
       for any other relief, Your Honor at
       the present time.

IJ:    Okay.
```

When asked whether the res judicata argument or the § 212(c)

argument had the better chance for success on appeal, DeLuca

responded that "[i]t was likely the 212(c)."  (Id. at 116).

The court credits Tenn's testimony and concludes that DeLuca

talked with Tenn about § 212(c), but only to explain that

§ 212(c) relief was no longer available.  He explained to Tenn

that if he lost on the res judicata argument and appealed,

§ 212(c) might become available again while the appeal was

pending, at which point, Tenn could move to reopen the case and

pursue a § 212(c) waiver.

DeLuca never advised Tenn about the alternative of applying

for a § 212(c) waiver immediately to obtain a stay of deportation

and taking the step of getting legally married to his common law

wife so that he would be eligible for Gabryelsky relief when

§ 212(c) relief became available again.

Tenn had previously applied for and been granted § 212(c)

relief, so he was familiar with § 212(c) relief.  Tenn and

Patrick had made plans to get married, which had been placed on hold first, because of issues with the location for the reception and then, because their relationship became strained. But they would have gotten legally, and legitimately, married "in a heartbeat" if they knew it would help Tenn with his immigration problems. It is implausible that Tenn would not have pursued the application for § 212(c) relief, together with marriage to Patrick and the § 245(a) adjustment of status necessary to make the § 212(c) application not futile, had he been advised of the availability of that option, particularly in view of the fact that the other option was a "long shot." Tenn has proven that DeLuca presented him with only one option.

Under the circumstances here, where the alien's attorney believed the alien would have been eligible for Gabryelsky relief and had "strong equities," the alien's attorney was aware of the arguments being made with respect to retroactive application of ADEPA § 440(d) and believed that § 212(c) relief would be available for persons like his client in a year or two, the attorney was in fact pursuing such relief for other clients, and the only other option was one that was characterized by the attorney as a "long shot" and not the option that gave the client the better chance on appeal, the court concludes that a competent attorney would have advised his client about and filed an application for § 212(c) relief, pursued an appeal of the denial,

and advised his client concerning <u>Gabryelsky</u> relief so the application would not be futile.

Indeed, in preparing his affidavit--without the benefit of having reviewed his file--DeLuca appeared certain that he had discussed with Tenn the options of marriage and adjustment of status and filing an application for § 212(c) relief before deciding to move to terminate the proceedings based on the doctrine of res judicata, and that he had advised Tenn to carefully reconsider electing an option that did not involve § 212(c) relief. But he was unable to make such definitive statements at the time he testified, after having reviewed his file. Most likely, DeLuca felt certain he had discussed all these matters with Tenn because, at the time he prepared that affidavit, he understood that discussing that course of action with Tenn would have been necessary to properly advise his client.

Tenn contends and DeLuca disputes that DeLuca was not present when Tenn signed the form waiving his right to appeal. However, that issue is not material because, in any event, Tenn's waiver of his right to appeal was not knowing and intelligent. <u>See</u> <u>United States v. Sosa</u>, 387 F.3d 131, 137 (2d Cir. 2004) (holding that an alien's explicit waiver of his right to an administrative appeal "was not knowing and intelligent" where he "was not informed of his right to apply for Section 212(c)

relief."). When Tenn signed the waiver of his right to appeal the IJ's ruling on the res judicata argument he had never been made aware by his counsel that he could have pursued <u>Gabryelsky</u> relief and the order of deportation would have been stayed while he appealed the denial of the § 212(c) application by the IJ and hoped that § 212(c) relief became available again for aliens in his situation. Under both approaches, a favorable outcome for Tenn hinged on § 212(c) relief becoming available again. But the court agrees with Tenn that if Tenn had been told that, in addition to the "long shot," he had the widely recognized option of <u>Gabryelsky</u> relief, it would have been "a totally different ball game." (Tr. 4/5/11, 44).

### 2. Prima Facie Eligibility; Strong Showing in Support of Application

At the time of his deportation hearing on December 23, 1998, Tenn was a lawful permanent resident who had lived in the United States for almost 20 years. Tenn pled guilty to criminal offenses in 1989, 1994 and 1995, before the enactment of AEDPA and IIRIRA and therefore with the possibility at the time of each plea of being granted a discretionary waiver under § 212(c). Although Tenn's prior firearm convictions barred him from obtaining § 212(c) relief, Tenn could have overcome this impediment by simultaneously applying for an adjustment of status under § 245(a). Therefore, Tenn was prima facie eligible for § 212(c) relief.

In addition, Tenn could have made a strong showing in support of an application for a § 212(c) waiver, including obtaining <u>Gabryelsky</u> relief so the § 212(c) application would not be futile. "A Section 212(c) determination involves a balancing of 'the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf to determine whether the granting of section 212(c) relief appears in the best interests of this country.'" <u>United States v. Copeland</u>, 376 F.3d 61, 74 (2d Cir. 2004) (citing <u>Matter of Marin</u>, 16 I. & N. Dec. 581, 584 (BIA 1978)).

For the purposes of this balancing test, <u>Copeland</u> lists the following adverse and favorable factors:

> Adverse factors include: the nature and circumstances of the exclusion ground at issue, the presence of additional immigration law violations, the existence of a criminal record and its nature, recency and seriousness, and the presence of other evidence indicative of an alien's bad character or undesirability as a permanent resident. Favorable considerations include: family ties within this country, residence of long duration in this country, arrival in the country at a young age, evidence of hardship to the alien and the alien's family upon deportation, Armed Forces service, employment history, community service, property or business ties, evidence attesting to good character, and, in the case of one convicted of criminal conduct, proof of genuine rehabilitation.

<u>Id.</u> at 74 (internal citations omitted).

The government correctly notes that IJs were cautious about granting Section 212(c) waivers to aliens convicted of drug-related offenses.  See, e.g., Correa v. Thornburgh, 901 F.2d 1166, 1170 (2d Cir. 1990) ("Drug offenders must present a showing of unusual countervailing equities to obtain a waiver, particularly if the grounds for exclusion involved trafficking in drugs.").  It is also true, however, that courts in this circuit have repeatedly held that favorable considerations such as family ties and educational and employment history can outweigh drug convictions.  See, e.g., United States v. Calderon, 391 F.3d 370, 376 (2d Cir. 2004) (affirming district court's finding that alien's positive equities, including his family ties and lengthy residence in the United States, most likely would have outweighed his conviction for possession of a controlled substance with intent to distribute); United States v. Perez, 330 F.3d 97, 102 (2d Cir. 2003) (affirming district court's finding that there was a reasonable probability that alien's significant family ties and history of steady employment in the United States would have outweighed his conviction for attempted sale of a controlled substance).

In fact, four years prior to Tenn's deportation hearing, the BIA clarified that it had no strict policy of denying § 212(c) relief to narcotics offenders:

> In sum, this Board has never implemented, in
> law or in fact, a strict policy of denying

> section 212(c) relief to every alien convicted
> of a serious drug offense without regard to
> the totality of circumstances presented in the
> case. Our established practice has been, and
> continues to be, to premise discretionary
> determination on the individual factors
> presented in a given case.

Matter of Burbano, 20 I. & N. Dec. 872, 879 (BIA 1994). See also

United States v. Castro, 472 F. Supp. 2d 321, 333 (E.D.N.Y. 2007)

(compiling several BIA cases where IJs granted § 212(c) waivers

on the basis of countervailing equities in cases where an alien

had been convicted of multiple and/or violent offenses).

In Tenn's case, there is a reasonable probability that a

court would have found that the favorable considerations

outweighed the adverse factors, all of which are related to his

criminal record.  On September 21, 1989, Tenn was sentenced, on

two charges concurrently, to 7 years imprisonment, suspended

after 30 months, and three years probation.  The charges were

carrying a pistol without a permit and possession of narcotics,

and they arose out of separate incidents.  Considering the

sentence imposed, these were obviously serious offenses, but not

so serious as to be outcome determinative for purposes of

balancing adverse factors and favorable considerations.  They do

not reflect that Tenn was a major drug dealer or a persistent

offender.  Subsequently, Tenn was convicted on May 3, 1994 of

unlawful discharge of a firearm, but this was an unclassified

misdemeanor for which he received a $200 fine, which is

consistent with the circumstances surrounding the commission of the offense, i.e., his intent was to scare off armed robbers. Thus his subsequent offense was less serious, not more serious, than the earlier offenses. Moreover, the June 9, 1995 conviction would not have counted against Tenn because it had been vacated, but in any event was one for which he received a two-year suspended sentence and two years probation.

On July 25, 1998, after the new deportation proceedings were commenced, Tenn and Patrick were involved in a domestic dispute and Patrick's mother, not Patrick, called the police. Tenn was not arrested until approximately two months later. After the incident, Tenn had continued to live with Patrick on and off at the house in Middletown and was living with her at the time he was arrested. Patrick's desire to continue the relationship would have been a mitigating factor with respect to this incident when the IJ assessed Tenn's character and the desirability of having him as a permanent resident.

As to the favorable considerations, Tenn had been admitted to the United States as a lawful permanent resident when he was 14 years old and had lived in Connecticut since that time. He had graduated from high school and gotten additional education at a trade school. Tenn had worked consistently in high school and after graduation, and paid income taxes. One of his convictions arose out of an incident where the business he was managing,

Dennis Market, was being robbed, _i.e._, the unlawful discharge of a firearm.

Tenn had very strong family ties. He had a common-law wife, Patrick, with whom he had been in a relationship since the early 1980s. Between 1986 and 1993, they had four children together. Together, they had purchased in 1996 the house owned by Patrick in Middletown. Patrick and Tenn lived together over a long period of time. Although they were not legally married, Tenn and Patrick considered themselves married and Patrick often used "Patrick-Tenn" as her last name. The couple had seriously discussed getting legally married and had made plans to do so. In fact, Patrick and Tenn would have gotten legally married had they understood that it made a difference for immigration purposes, and it is unlikely that an IJ would have viewed their becoming legally married with suspicion after taking into consideration their history together and the approach to marriage in Jamaican culture. See Godfrey A. Gibbison, A First Look at the Relationship Between a Mother's Marital Status and the Educational Attainment of Her Children in the Jamaican Context, Soc. & Econ. Stud., Vol. 49, No. 4, 227 (2000), available at http://www.jstor.org/stable/27865214 (noting that according to the 1989-1992 edition of the Jamaica Survey of Living Conditions ("JSCL"), of 881 women between the ages of 14 to 45 interviewed,

"only 21 percent were married, and 35 percent were in common-law unions.").

Tenn not only helped purchase Patrick's house in Middletown, but also took care of their children and took care of Patrick. In addition to the four children Tenn and Patrick had together, Tenn had another United States citizen child who had been born around 1996. Also, Tenn's mother and grandmother were both living here in 1998, as well as other relatives.

DeLuca confirmed that if Patrick and Tenn had gotten legally married, Tenn would have been able to establish that the marriage was a <u>bona fide</u> marriage with clear and convincing evidence. The government asked DeLuca if he could have met that standard:

> Q:   Now, in this case, given the history
>       between Mr. Tenn and Ms. Patrick, is
>       it fair to say that he probably
>       could have survived that challenge?
>
> A:   I think so.  He has children with
>       the mother.  And so if he married
>       the mother, I think ultimately it
>       would have been -- it would have
>       been approved.

(Tr. 4/5/11, 102).

Based on the foregoing, the court concludes that Tenn could have made a strong showing in support of his § 212(c) application.

## B.   Voluntary Departure

Tenn contends that his attorney's failure to advise him about voluntary departure constitutes ineffective assistance of

-40-

counsel.  DeLuca agrees that he did not discuss voluntary
departure with Tenn.

"Voluntary departure is a discretionary form of relief that
allows certain favored aliens--either before the conclusion of
removal proceedings or after being found deportable--to leave the
country willingly."  Dada v. Mukasey, 554 U.S. 1 , 8 (2008).  "If
voluntary departure relief is sought prior to the conclusion of
the removal proceeding, the alien must, among other things, make
no additional requests for relief and withdraw any such requests
that have been made, concede removability, and waive appeal of
all issues."  United States v. Garcia, No. 08 CR 32 (ARR), 2008
WL 3890167, at *5 (E.D.N.Y. Aug. 19, 2008).

"[T]he deprivation of voluntary departure rights may
constitute a 'fundamental error' in a deportation proceeding,
giving rise to a basis to seek collateral review of the
deportation order under 1326(d)."  Id. at *8.  However, under the
circumstances of this case the failure on the part of Tenn's
counsel to discuss voluntary departure with him does not
constitute fundamental error, or even any error.

Tenn informed DeLuca that his goal was to remain in the
United States with his family.  "[I]t was clear to [DeLuca] that
[Tenn's] ultimate aim was to try to remain in the United States
legally with his family and retain his green card."  (Tr. 4/5/11,
124).  DeLuca understood that if Tenn had been granted leave to

voluntarily depart, he would be giving up his green card and he would not have been eligible to return to the United States legally because of a previous weapons conviction.  The only practical way Tenn could have accomplished his goal of being in the United States with his family would have been by departing voluntarily and then reentering the United States illegally. But, if Tenn had left the country under that scenario, he would have become ineligible for § 212(c) relief because of the requirement that the individual have "a lawful unrelinquished domicile of seven consecutive years."  8 U.S.C. § 1182(c) (effective to April 23, 1996).  Voluntary departure was therefore inconsistent with Tenn's stated goals.

For the foregoing reasons, DeLuca's failure to advise Tenn about voluntary departure does not constitute ineffective assistance of counsel.

## IV.  CONCLUSION

For the reasons set forth above, ineffective assistance of counsel in connection with the defendant's deportation proceedings rendered the deportation order on which the indictment in this case is predicated fundamentally unfair in violation of Tenn's right to due process.  Accordingly, the defendant's motion to dismiss the indictment (Doc. No. 72) is hereby GRANTED.

The Clerk shall enter judgment in favor of the defendant and close this case.

It is so ordered.

Dated this 28th day of February 2012, at Hartford, Connecticut.

_____/s/_____
Alvin W. Thompson
United States District Judge
